1                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF NEW YORK

2

3  --------------------------------X
                          :

4  UNITED STATES OF AMERICA,    :
                          :  11-CR-371 (KAM)

5                          :

6               v.        :
                          :  225 Cadman Plaza East

7  FRANKLIN GILLESPIE,         :  Brooklyn, New York
                          :

8             Defendant.    :  September 3, 2014
  --------------------------------X

9

10     TRANSCRIPT OF CIVIL CAUSE FOR VIOLATION OF PROBATION
           BEFORE THE HONORABLE JAMES ORENSTEIN
             UNITED STATES MAGISTRATE JUDGE

11

12  APPEARANCES:

13  For the Government:      UNITED STATES ATTORNEY'S OFFICE
                      BY: LAUREN ELBERT, ESQ.

14                      Eastern District of New York
                      271 Cadman Plaza East

15                      Brooklyn, New York  11201-1820

16

17  For the Defendant:       KANNAN SUNDARAM, ESQ.

18

19

20

21  Court Transcriber:       SHARI RIEMER, CET-805
                      TypeWrite Word Processing Service

22                      211 N. Milton Road
                      Saratoga Springs, New York 12866

23

24

25

Proceedings recorded by electronic sound recording, transcript
produced by transcription service

2

1   (Proceedings began at 3:08 p.m.)

2   (Microphones not working properly)

3           THE CLERK: Criminal Cause for Violation of

4   Probation, Case No. 11-CR-371, <u>United States v. Franklin</u>

5   <u>Gillespie</u>.

6           Counsel, name for the record.

7           MS. ELBERT:  Good afternoon, Your Honor.  Lauren

8   Elbert for the United States and with me from the Probation

9   Department is Probation Officer Lee Kwak.

10          THE COURT: Good afternoon to you both.

11          MR. SUNDARAM:  Kannan Sundaram, Federal Defenders

12  for Mr. Gillespie.  Good afternoon.

13          THE COURT: Good afternoon.  You're Mr. Gillespie?

14          THE DEFENDANT: Correct.

15          THE COURT: Good afternoon, sir.  Mr. Gillespie,

16  you're here because the probation department has accused you

17  of violating the conditions of your supervised release.  The

18  charges are written down in a report and I think there's a

19  supplement to the report.  That's two separate documents.

20  Have you had a chance to read those and review them with your

21  attorney?

22          THE DEFENDANT: Yes, sir.

23          THE COURT: Do you understand what you're accused of?

24          THE DEFENDANT: Yes.

25          THE COURT: You're not to answer to the charges

3

1  today. I want to make sure you understand your rights.  First

2  of all, you have the right to an attorney.  Do you understand

3  that?  Yes?

4          THE DEFENDANT: Yes, sir.

5          THE COURT: As he did in the original case Mr.

6  Sundaram has been appointed to represent you.  Have you had a

7  chance to meet with him and discuss the case?

8          THE DEFENDANT: Yes.

9          THE COURT: You also have the right not to make any

10  statements.  I don't know if you've said anything so far.  If

11  you have you don't need to continue if you don't want to.  If

12  you decide later you do wish to say something you can stop any

13  time you'd like.  What you must understand is that anything

14  you do say can be used against you.  Do you understand that?

15          THE DEFENDANT: Yes, sir.

16          THE COURT: Do you have, folks, a date to appear

17  before Judge Matsumoto?

18          MS. ELBERT: We do.  September 15th at 10:30.

19          THE COURT: What if anything have you [inaudible]

20  with respect to release and conditions?

21          MS. ELBERT: Your Honor, the Probation Department and

22  the Government have a different view as to an appropriate way

23  forward as far as his release.  From the Government's

24  perspective he's been on electronic monitoring with a curfew.

25  I think between now and September 15th I agree with defense

4

1  counsel that it would be appropriate to place him on house

2  arrest with electronic monitoring, get rid of the curfew

3  [inaudible] home without him having advanced authorization

4  from the Probation Department.  In the Government's view he

5  doesn't pose a likely risk of flight but the Probation

6  Department I understand has a different view [inaudible] give

7  them an opportunity to put that on the record.

8       MR. KWAK:  Your Honor, basically he's only been on

9  supervision for over a month now.  He has two very serious

10 arrests in that time.  He has been on house arrest with us for

11 that time and in the violation report he's already had both

12 [inaudible] issues as far as [inaudible].  So so far with

13 [inaudible] has not been ideal [inaudible] house arrest

14 [inaudible].

15      THE COURT: Mr. Sundaram, do you wish to be heard?

16 Do you wish to be heard on this?

17      MR. SUNDARAM: Yes, Your Honor.  I share the

18 Government's view.  I spoke to the AUSA about the case and Mr.

19 Gillespie's situation and I'm asking that the court release

20 Mr. Gillespie on a personal recognizance bond with the

21 condition that his curfew -- I'm proposing with the Government

22 that he not have any curfew and that he simply be confined to

23 home detention.  We acknowledge and I think he's acknowledged

24 with his probation officer of his actual probation officer

25 [inaudible].  I think the probation officer before the court

1    is not his actual probation officer.  He's filling in for him

2    today but Mr. Gillespie has addressed some of those issues

3    with his probation office.  He's acknowledged that he took a

4    number of unauthorized leaves from his house literally to go

5    outside and smoke.  He also did have some arguments with a

6    young woman he was in some sort of a relationship with and

7    that was -- that also [inaudible] for some of the absences

8    [inaudible] not been -- since his most recent arrest he has

9    not left his home.

10       He also has a -- he has worked during some of this

11   brief of period doing construction.  His probation officer is

12   aware of that.  He has pay stubs at home that would also

13   corroborate that.  He -- currently he has actually secured a

14   job painting.  This is with his father who works in that

15   business.  It would be 12 hours a day, not necessarily every

16   day of the week.  It wouldn't be on weekends.  It would be 12

17   p.m. to 12 a.m.  His probation officer, Mr. Emrick [Ph.], was

18   -- Mr. Gillespie was awaiting his probation officer, Mr.

19   Emrick, to confirm with his father or whoever he'd be working

20   with the hours of -- to make any necessary adjustments in his

21   curfew but the only request we would have is that he be

22   allowed to have the curfew be set.

23       If the court grants our request then we would ask

24   that the probation officer, the Probation Department have the

25   authority to adjust that condition to allow him to work on

6

1   making whatever inquiry that they make.  If the court needs I

2   can also address the charges to the extent I've been able to.

3          THE COURT: I will want you to.  First a question to

4   Officer Kwak.  Your position is that after consulting with

5   Officer Emrick or have you had a chance to do that?

6          MR. KWAK: I spoke with the supervisor.

7          THE COURT: I'm happy to hear from everybody about

8   this but there are two aspects in particular that are a

9   concern to me.  One is that to the extent the proposal would

10  be changing it from curfew to essentially home detention, home

11  confinement, it's not simply that he disregarded the

12  requirement to stay in his home during the period when he's

13  supposed to but that one of the allegations, a more serious

14  offense takes place during one of those periods of departure

15  and then the second frankly a much greater concern is last

16  week or the week before he had a loaded gun and -- if that's

17  in dispute I'd like to know that.  If it's not I want to know

18  the circumstances.  What's he doing with a loaded gun?

19         MR. SUNDARAM: First, it is in dispute.  Just to give

20  the court a little more factual information about the status

21  of that so called case.

22         THE COURT: Well, it is a case.

23         MR. SUNDARAM:  It's not a case.

24         THE COURT: It's not a case?

25         MR. SUNDARAM: He was -- it's been dismissed by the

7

1  NYPD.

2          THE COURT: So it's a case it's just no longer active

3  or no longer pending.

4          MR. SUNDARAM: Well --

5          THE COURT: Are you saying he wasn't actually

6  arrested?

7          MR. SUNDARAM: No, he was arrested and then what

8  happened in this -- and I'm not faulting anybody here.  I mean

9  this report was filed.  At the time it was filed the

10 expectation was that he was going to be in custody until he

11 faced arraignment but what actually happened is he was

12 arrested on August 26th.  He was at the precinct over night.

13 The next morning he was released by the NYPD and the case was

14 dismissed by them.  So there is no active case.  There's no

15 court case whatsoever.

16         THE COURT: Okay.  I have --

17         MR. SUNDARAM: We're not saying he wasn't arrested.

18 We're saying the case is dismissed.

19         THE COURT: Okay.  But what happened?  Was he

20 carrying a firearm?

21         MR. SUNDARAM: He was not.  The gun was not on his

22 person.  Of course --

23         THE COURT: Where was it?

24         MR. SUNDARAM: It was -- where he was arrested you'll

25 notice from the information we have is the address where he

8

1   lives.  He was outside with a large group of people.  It was

2   his brother's birthday.  There was a cookout.  That's why he

3   was -- he agrees that he was not supposed to be out because it

4   was past 7:00.  He was outside attending with some 40 other

5   people.  I have -- I'm not saying that I've been able to

6   investigate this with outside sources at this point.  I'm just

7   reporting what the circumstances of the possession charge

8   would have been.  There was no gun found on his person.  The

9   police searched many people including my client.  They did not

10  find a gun on his person.  There was a gun recovered from

11  outside somewhere.  They charged him with it and then they

12  released him.

13          THE COURT: The report I have is that an officer --

14  the arresting officer frisked your client and found a loaded

15  firearm.  You're saying that's not true.

16          MR. SUNDARAM: That's correct, that's not true.

17          THE COURT: What, if anything, can the Probation

18  Department or the Government tell me about that?

19          MR. KWAK: Your Honor, this is only from the arrest

20  report I received.  I'm not sure if Officer Emrick has

21  interviewed the arresting officer as of yet.

22          THE COURT: Ms. Elbert.

23          MS. ELBERT: I have no additional information at this

24  time.

25          THE COURT: Mr. Sundaram, what do you want to tell me

9

1  about the earlier assault charge that is alleged to have

2  occurred during these periods when he left his home when he

3  wasn't supposed to?

4          MR. SUNDARAM: Again, I think Mr. Gillespie is not

5  denying a curfew violation or a home detention violation.

6          THE COURT: Right.  But I'm concerned about what he

7  did during that curfew violation that speaks --

8          MR. SUNDARAM: I understand.

9          THE COURT: [Inaudible] violence that is of great

10 concern.

11         MR. SUNDARAM:  Well, as he -- he's denying the

12 substance of those charges.  He's denying the assault charge.

13 With respect to -- what we do know about the case is this.  He

14 was released on his own recognizance.  I've confirmed this by

15 looking up that arraignment I understand that that doesn't

16 [inaudible] --

17         THE COURT: Mr. Sundaram, you know that that's not at

18 all what I'm asking about.  I'm asking about what happened,

19 not whether he was released because I'm making the decision on

20 release.

21         MR. SUNDARAM: What happened is he's denying that he

22 committed an assault.  He's denying --

23         THE COURT: What happened in the incident for which

24 he was arrested?  What's his version of the events?

25                 [Pause in proceedings.]

1      THE DEFENDANT: Basically what happened was she saw

2  me with another girl.  We started arguing and whatever the

3  case may be.  She strikes my face.  I hold her and then them

4  two started fighting.  Them two girls started fighting, the

5  one I was with and her got into a fight and then she went and

6  said that I did something to her.  That's what happened

7  because she's saying that she didn't even say it.  Right now

8  it's a whole issue.  She gave me the papers saying that she

9  did not press charges or a bunch of things going on with that.

10  I got her name but I don't know her number by heart.

11      MR. SUNDARAM: Your Honor, the other thing that I

12  think -- with respect to some of these absences from his home,

13  from his home that he discussed with his probation officer

14  when he was having this argument with the same person those

15  were like literally outside his home in the early morning

16  hours.  So what's happening is --

17      THE COURT: What does that matter?  He's not supposed

18  to be outside and he repeatedly -- he hasn't been on

19  supervised release very long.  Time after time after time he

20  just didn't [inaudible] requirements are.

21      MR. SUNDARAM: Because [inaudible] responded to Your

22  Honor's question about what happened and what he's saying

23  happened.  I'm saying it's just relevant that she's coming to

24  his house at three in the morning and arguing with him and

25  fighting with him.  He's not -- he hasn't -- basically she's

11

1  falsely accusing him.

2          THE COURT: And these multiple violations of the

3  curfew?  I mean look, you're asking me to say here's a guy who

4  leaves his home time after time after time when he's not

5  supposed to and what you want me to do is send him back to his

6  home.  What's going to be different?

7          MR. SUNDARAM: What's going to be different is we

8  don't have a long history here since he was released.

9          THE COURT: And it all points in one direction.  That

10 is my concern.

11         MR. SUNDARAM: But if you break down that small

12 period of time, since I think August 27th -- August 26th when he

13 left the home and was arrested by the NYPD he has not left the

14 home for any reason.  The woman who he was involved with who

15 was coming to his home before making noise, pounding on the

16 door three in the morning, he lives with his grandmother.  He

17 would step out of the house.  She would say go talk to her,

18 don't bring this into my house, and that situation isn't

19 happening any more.  She's not coming by any more.  He's not

20 going to -- he has not left his house since August 26th.  He

21 has addressed the issue with his probation officer and he's

22 been on this with his probation officer and telling him,

23 admitting that he did leave the house a few times.  You'll

24 notice many of the absences were eight to fifteen minutes and

25 that's when he was out smoking.

1          THE COURT: So it's okay to leave the home for 15

2    minutes because he's smoking?

3          MR. SUNDARAM: No, I'm just saying that he has --

4    we're not saying it's okay.  We're saying that he addressed

5    that with his probation officer and he stopped doing that.

6          THE COURT: The -- this is a honest -- it's not a

7    pointed question at all.  I honestly [inaudible].  It's your

8    burden because it's a supervised release violation to show

9    clear and convincing -- by clear and convincing standard that

10   this will alleviate the risk to the community and the risk of

11   flight; correct?

12         MR. SUNDARAM: Yes.

13         THE COURT: You agree with that?

14         MS. ELBERT: Yes.

15         THE COURT: What am I missing that you're seeing?

16   Because I have a great concern even if the standard were as it

17   is in a pretrial context I have a great concern and I'm

18   absolutely not seeing how what Mr. Sundaram is telling me

19   meets the high burden.  So what am I missing that you're

20   seeing in agreeing to continuing him [inaudible] today?

21         MS. ELBERT: Sure.  I think for Your Honor obviously

22   there are two separate issues, the issue of the violation

23   itself and the appropriate punishment for the violation and

24   the issue of whether it's appropriate that he be remanded

25   pending the resolution of the violation.  I agree that the

13

1  allegations are serious.

2          However, as Mr. Sundaram pointed out even though

3  he's been non compliant with the curfew periodically it has

4  been for a few minutes at a time.  This is something that we

5  see a lot.  It does not indicate to me somebody who is going

6  to shirk his responsibilities and not appear in court for the

7  resolution of the violation.  So to me not that that's not a

8  serious violation but it's not the kind of non compliance that

9  gives me pause that he's not going to appear in court for the

10 next [inaudible].

11         In terms of the allegations relating to the new

12 arrest, as Mr. Sundaram stated, the gun charge was dismissed.

13 I don't have any additional information on that but based on

14 the dismissal I don't think that I can really rely on that to

15 argue that the defendant poses a risk to the community.  We're

16 not withdrawing the charge.  I just --

17         THE COURT: So you believe that there's a basis to

18 have his -- have him -- convicted is not the right word.  But

19 there's a basis for a charge that he violated the conditions

20 of the supervised release by virtue of possessing a loaded

21 firearm but a charge that you have to prove.  So you think you

22 can establish that charge but you also think that the fact

23 that it was dismissed in the state court means that

24 [inaudible] by clear and convincing evidence that he's not a

25 danger to the community for possessing the same loaded firearm

14

1   [inaudible].  I don't understand the logic.

2          MS. ELBERT: Your Honor, I think that at the time

3   these allegations were launched that charge had not been

4   dismissed.  I do not have any information about why it was

5   dismissed.  I have not personally spoken to the officer.  This

6   is not my case.  I just am standing up on it as of an hour

7   ago.  But based on the fact it was dismissed I don't think

8   it's fair to me to assert that he presents a danger to the

9   community when I have no additional information other than the

10  fact that he was arrested.

11         THE COURT: I don't want to discourage you from doing

12  something that you think is fair.  I think it's absolutely the

13  right thing to do but frankly I wholly disagree.  I think that

14  there's -- it may be, Mr. Gillespie, you are a very, very

15  unlucky man and that you keep finding yourself in situations

16  where somebody wrongly accuses you of assault and somebody

17  else wrongly has a gun and a cop wrongly thinks it's found on

18  your person but you're not convincing me by clear and

19  convincing evidence that there's not a risk to the community.

20         MR. SUNDARAM: I'm sorry, Judge.  There is actually

21  one significant fact that I think speaks to concerns about

22  risk of flight that [inaudible] omitted and forgot to get to.

23         THE COURT: Okay.

24         MR. SUNDARAM: Is with respect to this, him coming

25  appearing before the court today, the first -- he was

1   contacted by the police officer, Officer Emrick, the day

2   before yesterday he received a text message to call him and

3   then he called him and they spoke and he was told -- he was

4   directed to appear today at the Probation Office at 9:30 in

5   the morning and he understood this was in the context of what

6   had been happening with the arrest.  He understood that he was

7   going to be facing violation charges.  He did appear at 9:30

8   in the morning to probation.  This is not a situation where he

9   knew about the charges and wasn't coming.   It was not a

10  situation where they just showed up at his house at six in the

11  morning as is often the case for arrest and it's a situation

12  where they told him to come in and he did.  So I think it's

13  tantamount to turning himself in which I think does address

14  concerns about the risk of flight.

15          THE COURT: I would not enter a permanent order of

16  detention based solely on risk of flight but I am very

17  concerned about danger to the community and you haven't

18  persuaded me that I shouldn't have that concern.  So I'm going

19  to enter a permanent order of detention.

20          MR. SUNDARAM: Your Honor, that will be with leave to

21  make a bail application?

22          THE COURT: You can make any application you like but

23  I'm making the finding that no condition or combination of

24  conditions based on the record that's been presented to me

25  would alleviate the risk of danger to the community and

16

1    [inaudible].  By all means you have the Government on your

2    side here.  So seek review of this decision.  I have to give

3    you my best decision which is I don't think you have

4    demonstrated by clear and convincing evidence that there's not

5    a risk of danger to the community where the Government is

6    continuing to press the charge that your client had a loaded

7    firearm that was found on a frisk of his person and that he

8    committed an assault of somebody who ended up with -- I lost

9    my place in the report but with demonstrable and noticeable

10   injuries to her person committed while he left his apartment

11   during the time when he was supposed to be staying in the

12   apartment.

13            So I don't have a record on which I think consistent

14   with the Bail Reform Act I can lawfully release your client

15   and I don't think different bail conditions would change that.

16   So that's my decision.  You are of course free to seek review.

17   I encourage you to do it.

18            Anything else for today?

19            MS. ELBERT: No, Your Honor.

20            MR. SUNDARAM: Nothing.

21   (Proceedings concluded at 3:28 p.m.)

22                          *  *  *  *  *

23

24

25

17

1      I certify that the foregoing is a court transcript from

2 an electronic sound recording of the proceedings in the above-

3 entitled matter.

4

5 _____

6                    Shari Riemer, CET-805

7 Dated:  September 15, 2014